**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| SHANIE M. RUDDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 11 CV 50286 |
| v. ) | Honorable Iain D. Johnston |
| ) | Magistrate Judge |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Shanie Rudder ("Claimant") brings this action under 42 U.S.C. §

405(g), seeking a reversal, or, in the alternative, remand of the decision by

Defendant, Carolyn Colvin, Commissioner of Social Security ("Commissioner"),

denying her application for Disability Insurance Benefits under Title II of the Social

Security Act ("SSA"). This matter is before the Court on cross-motions for summary

judgment. Dkt. ## 18, 24.

Claimant argues that the Commissioner's decision to deny her application for

benefits should be reversed or remanded because her claim and the evidence

supporting it were not fully considered by the Administrative Law Judge ("ALJ").

The Commissioner argues that the ALJ's determination that Claimant was not as

functionally impaired as alleged is supported by the record, he did not ignore

material evidence, and should be affirmed. For the reasons set forth below,

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-
Respondent pursuant to Federal Rule of Civil Procedure 25(d).

Claimant's motion for summary judgment (Dkt. # 18) is granted, and the Commissioner's motion (Dkt. # 24) is denied. The Court declines to award benefits, and the matter is remanded for additional proceedings consistent with this Memorandum Opinion and Order.

# I. BACKGROUND

## A. *Procedural History*

Claimant filed her application for benefits on April 13, 2007, alleging a disability onset of multiple sclerosis as of December 1, 2003. R. 21. Claimant's date last insured ("DLI") was December 31, 2003. R. 167. Claimant's initial application was denied on August 3, 2007, and upon reconsideration on August 31, 2007. R. 21. Three hearings were held before the ALJ, Robert Karmgard, in May 2008, November 2008, and February 2009.[2] R. 33–166. Claimant was represented by counsel and appeared before the ALJ at each hearing. Claimant testified at the May 2008 and February 2009 hearings. R. 103–112, 40–62. The medical expert ("ME"), Dr. Roland Manfredi, M.D. appeared and testified at the November 2008 and February 2009 hearings. R. 149–166, 62–91. The Vocational Expert ("VE") appeared and testified at the February 2009 hearing. R. 91–102. The ALJ determined that Claimant was not disabled through the DLI and denied her benefits on April 29, 2009. R 32. The Appeals Council denied Claimant's request for review, making the ALJ's decision the final decision of the Commissioner. R. 4. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

---

[2] The ALJ reconvened the hearing twice to secure missing medical records after the first hearing and because certain documents were not provided to the medical examiner before his testimony at the second hearing. R. 21.

### B. Hearing Testimony

#### 1. Claimant

Claimant testified that she was 39 years old and married with three children. R. 120. She completed high school and two years of college. R. 120. Claimant testified that she was 5'4" and weighed approximately 125–130 pounds since as far back as 2003. R. 121.

Claimant worked in sales for a publishing company for nine years. R. 43. In 1998, she ended that employment and became a stay at home caregiver to her two children because the combination of working and taking care of her children left her fatigued. R. 43–45. She also worked as a grocery bagger on a part-time basis for one week in January 2007. R. 126. She left her job as a bagger when she began to feel numbness and tingling on the left side of her body. R. 127.

At the hearing, Claimant testified that she began having difficulties swallowing food in 2002 or 2003. R. 59. She first sought medical care in 2002 because she was stumbling, dizzy, and had become "very klutzy." R. 123, 134. She experienced continued severe fatigue, dizziness, and difficulty swallowing in December 2003. R. 42. Her dizzy episodes were "off and on," lasting a few minutes at time, and stopping if she sat down. R. 42. Also in December 2003, Claimant experienced trouble focusing and concentrating after reading for approximately ten minutes. R. 50, 60. Claimant testified that she first began experiencing left side numbness sometime in 2003. R. 45.

Claimant testified that from 2002 to 2005, she sought treatment for a

combination of dizziness, severe fatigue, problems swallowing, ear problems, and loss of balance. R. 42-43, 45, 50, 60, 123, 134-35. She testified that during that time, her doctors misdiagnosed her disease and told her "it was all in [her] head for a long time." R. 134, 143. Claimant testified that she lost health insurance coverage for a period in 2006. R. 31-32; 35. She testified that she sought care from Dr. Ferley for fatigue, dizziness, slurred speech, and problems swallowing in March 2007. R. 134. She indicated that other people noticed her slurred speech before she noticed it. R. 134. Claimant stumbled every day. R. 135. Her doctor placed her on prescription medication, Rebif[3], to address her multiple sclerosis symptoms in 2007. R. 148.

Claimant testified that her daily activities included taking care of her kids, doing laundry, and cooking. R. 129. She usually spent her days staying around her house, she napped, and sometimes cooked dinner. R. 132. She described these daily activities as "a little trying." R. 129. Claimant testified that in total, she spent approximately one hour per day doing chores. R. 133. When asked if her activity level had changed since 2003, Claimant indicated that it had not. R. 133. Starting in 2002 or 2003, Claimant began taking about a half hour nap per day, which increased in duration over the years. R. 144. She also testified that she

---

[3] Rebif is an interferon beta administered by subcutaneous injection up to three times per week. It is "indicated for the treatment of patients with relapsing forms of multiple sclerosis to decrease the frequency of clinical exacerbations and delay the accumulation of physical disability." EMD SERONO, INC., MEDICATION GUIDE AND INSTRUCTIONS FOR USE FOR REBIF (INTERFERON BETA-1A) FOR SUBCUTANEOUS INJECTION 1 (April 2014) *available at* http://www.emdserono.com/cmg.emdserono_us/en/images/rebif_tcm115_19765.pdf.

experienced Bell's palsy[4] a few months before her hearing testimony.  R. 141.

## 2.  State Medical Expert

The non-treating ME, Dr. Manfredi, opined that Claimant had early stages of multiple sclerosis in 2003 that continued to the present. R. 77, 85–86.  The ALJ prompted Dr. Manfredi to opine as to Claimant's level of disability over the years. R. 88–89.  Dr. Manfredi could not opine with any degree of medical certainty whether the level of limitation present in 2007 was present in 2003.  R. 89.  He made this assessment based on the medical records that he had received from Claimant's medical providers. *Id.*  Dr. Manfredi testified that an interval neurological evaluation before her DLI was needed to assess her neurological system during that time period.  R. 89.  Dr. Manfredi did not attach any significance to the gap in Claimant's medical records when she was not under the care of a physician between October 2005 and March 2007.  R. 75.  Dr. Manfredi also opined that Claimant possibly met a motor dysfunction listing during the five-year period when she experienced motor dysfunction.  R. 89.  Dr. Manfredi explained that by nature, multiple sclerosis is a progressive condition that "goes up and down."  R. 88. Dr. Manfredi also testified that it was possible for Claimant to have "recurrents" where she would have been temporarily disabled and then improve, as early as 2003. R. 88–89.

Dr. Manfredi testified that from December 1, 2003 through the February 19, 2009 hearing, Claimant's symptoms included gait abnormalities, weakness, ataxia,

---

[4] Bell's palsy is "paresis or paralysis, usually unilateral, of the facial muscles, caused by dysfunction of the 7th cranial nerve; probably due to a viral infection; usually demyelinating in type." *See* Stedman's Medical Dictionary 1285 (26th ed. 1995).

occasional difficulty speaking, and difficulty walking. R. 70–71. As to the extent of her neurological impairment, Dr. Manfredi opined that in 2003, Claimant's impairment were likely in the early stages and were not disabling at that time. R. 85–86.

### 3. Vocational Expert

The VE, Frank Mendrick, also testified at the February 2009 hearing. During his testimony, the ALJ posed three hypotheticals involving a female with a job and educational background identical to that of Claimant, but with varying degrees of limitations. R. 95–96. The first hypothetical female could lift and carry up to a maximum of 20 pounds on an occasional basis and 10 pounds frequently; may sit, stand, and walk with normal breaks for up to six hours each within an eight-hour day. R. 96. The person could not climb ladders, ropes, or scaffolds, but may otherwise climb ramps or stairs, balance, stoops, kneel crouch and crawl on no more than an occasional basis; must avoid exposure to hazards such as exposed unprotected heights and excavations and exposed, unprotected, dangerous, moving machinery. R. 95–96. The VE opined that these limitations would not affect the person's ability to do past work. R. 96.

The ALJ's second hypothetical female had additional limitations, including: lifting only up to 10 pounds on occasion and lighter items such as small hand tools or case files on a frequent basis, and standing and walking with normal breaks up to two hours per day with not more than fifteen minutes continuously at a time. *Id*. The VE opined that this person could still do data entry processing work. *Id*. The

VE opined that there are roughly 8,500 jobs in the region at this sedentary, unskilled labor level. *Id*. He also opined that there were approximately 2,500 unskilled jobs (such as a hand laborer) in the region. R. 97.

The ALJ's final hypothetical included the following limitations: the individual could not lift up to 10 pounds on occasion; could sit for no more than a combined total of one hour; could stand and walk for less than an hour in an eight-hour workday; could occasionally use her hands; and could not operate foot controls. R. 99. The VE opined that such limitations resulted in less than sedentary work foreclosing all competitive full-time employment in any variety. R. 100.

### C. *Medical Evidence*

#### 1. <u>Symptoms and Treatment Before Multiple Sclerosis Diagnosis</u>

In May 2002, Claimant visited Dr. Christy Benton, F.N.P., on two separate occasions due to dizziness with exertion, back pain, and stiffness. R. 331, 336. Specifically, Claimant reported that she lost her balance when dizzy but regained it after several minutes. R. 336. Dr. Benton diagnosed Claimant with a lumbosacral sprain/strain and benign vertigo. R. 331. In October 2002, Claimant visited Dr. Benton again because her ear felt clogged. R. 328. Dr. Benton diagnosed Claimant with Chronic Serous Otitis Media and prescribed Rhinocort and Clarinex medications. R. 328–29, 343.

On May 22, 2003, Claimant visited Dr. Michael Lesser, M.D., for ear, chest, and stomach pain lasting two weeks. R. 325-27. Claimant reported no fatigue or malaise. R. 325. Dr. Lesser diagnosed Claimant with Eustachian Tube Dysfunction.

R. 327.  The following month, Claimant returned to Dr. Lesser because she had pain

in her right chest.  R. 322.  She again denied experiencing fatigue or malaise, and

reported that her ear pain had improved.  *Id.*  Dr. Lasser diagnosed Claimant with

a viral infection, likely strep throat.  R. 323.

Claimant next sought treatment with Dr. O'Connel on August 9, 2004

because she had experienced episodes of dizziness with headaches and problems

swallowing over the last year.  R. 355.  Dr. O'Connel diagnosed Claimant with

dizziness, tension headaches, and dysphagia.[5] R. 356.

On April 1, 2005, Claimant saw Dr. O'Connel again and complained of

headaches and feeling off-balance at times.  R. 345.  In October 2005, Claimant

reported continued sore throat issues, balance problems, and headaches during two

visits with Dr. O'Connel.  R. 343–46.  On October 19, 2005, Dr. O'Connel sent

Claimant for a CT of her abdomen and pelvis due to frequent urination and

microscopic hematuria—the results were normal.  R. 357.

There are no medical records between November 2005 and March 2007.  R.

26.

## 2. <u>Treatment and Symptoms After Multiple Sclerosis Diagnosis</u>

On March 23, 2007, Claimant visited neurologist Dr. Lisa Ferley, M.D., for

an initial neurological evaluation for a chronic and progressing imbalance of at least

a five-year duration.  R. 364.  Claimant reported some incoordination of her limbs,

imbalance with occasional falls, occasional difficulty swallowing, and a sensation of

things getting stuck in her throat at times, although only with solid foods, not

---

[5] Dysphagia is "difficulty in swallowing."  *See* Stedman's Medical Dictionary 534 (26th ed. 1995).

liquids. R. 364. Claimant also reported that she experienced significant fatigue and tiredness, and napped during the day when possible. *Id*. Dr. Ferley opined that Claimant's history and examination were consistent with a progressive neurologic disorder with symptomatic and progressing limb and speech ataxia, and that eye movements also revealed some incoordination. R. 365. She further opined that given Claimant's examination and age, multiple sclerosis was the most likely diagnosis. *Id*. Dr. Ferley ordered an MRI of Claimant's cervical spine and brain pre and post contrast. *Id*. The MRI revealed innumerable white lesions consistent with demyelinating plaques of multiples sclerosis. R. 371. The MRI of the cervical spine also showed innumerable lesions in the brain stem and pons related to a demyelinating process. R. 369.

On April 4, 2007, after the MRI, Dr. Ferley confirmed a diagnosis of multiple sclerosis. R. 362, 365. Claimant also received an evaluation and care at the Rush Medical Center Multiple Sclerosis Center with Dr. Roumen Balabanov, M.D. R. 385. On May 7, 2007, Dr. Balabanov reviewed Claimant's two MRI scans and noted that she had a history of balance problems and lightheadedness dating back to 2002. R. 382. On September 7, 2007, Dr. Balabanov wrote a letter opining that the onset of Claimant's condition was December 2003 and the course was chronic and progressive. R. 385. He also explained that her prognosis was "unclear and likely to progress." *Id*.

On August 28, 2007, Claimant visited another neurologist, Dr. Mehesh N. Parikh, M.D., for a second opinion. R. 437. During this appointment, Claimant

reported experiencing fatigue, slurred speech, and poor balance for the past five years. *Id*. Dr. Parikh also noted during his neurologic review that she had dizziness, speech difficulty, facial numbness, choking, poor balance, and walking issues. R. 440. Dr. Parikh observed right facial weakness and abnormal gait ataxia. R. 437–38.

On August 29, 2007, Claimant was admitted to the hospital for an acute exacerbation of multiple sclerosis. R. 441. During this hospitalization, Claimant underwent an electroencephalography ("EEG"), MRIs, and evoked potentials. R. 441–49. Claimant's EEG was normal. R. 445. Similar to her previous MRI scans, Claimant's brain MRI showed innumerable lesions in the deep and periventricular white matter. R. 446. There was also mild-to-moderate edema surrounding the larger lesions. *Id*. Claimant's evoked potential testing revealed abnormal visual response, brainstem auditory response, and tibial nerve somatosensory response in both of her legs. R. 441–43.

On March 11, 2008, Dr. Parikh wrote a letter regarding his care and treatment of Claimant. R. 390. He explained that he followed Claimant over the last couple of months and determined that she suffered from expressive aphasia, weakness, and gait ataxia. *Id*. Dr. Parikh indicated that after reviewing her symptoms, which began in 2003, it was his medical opinion that Claimant was totally disabled as of 2003. *Id*.

In July 2008, the Bureau of Disability Determination Services ("DDS") sent Claimant to a neurologist, Dr. Hien Dang, M.D., for an evaluation. R. 459. Dr.

Dang reviewed Claimant's medical records and conducted a neurological examination. R. 459–60. Dr. Dang's clinical impression was that Claimant suffered from severe multiple sclerosis with recent faster deterioration. R. 461. Dr. Dang did not opine as to the onset of her multiple sclerosis. Dr. Dang filled out a "Medical Source Statement of Ability to do Work-Related Activities (Physical)." R. 462–67. Dr. Dang imposed various limits on Claimant's current physical capabilities, including that she can never lift up to 10 lbs., never carry up to 10 lbs., and can sit for up to one hour per 8 hour work day. R. 462–63.

On October 16, 2008, Dr. Parikh conducted a comprehensive follow-up to Claimant's emergency room visit in early October 2008 for acute multiple sclerosis exacerbation with residual left hemiparesis, facial swelling, and speech difficulty. R. 474-77. Dr. Parikh reiterated that Claimant was totally disabled and not able to work on a regular basis or in a regular job even with limitations. R. 474.

### D. ALJ Decision

First, the ALJ reserved a finding on whether Claimant had engaged in substantial gainful activity from the alleged onset date to DLI because of other "valid" bases for denial of the claim. R. 23. Second, the ALJ presumed that Claimant had a severe impairment of multiple sclerosis as of December 2003 for the purposes of his analysis. *Id.* Third, the ALJ found that this impairment did not meet or equal one of the listed impairments. R. 24. Fourth, the ALJ found that Claimant had the residual functional capacity ("RFC") to perform a restricted range of sedentary work as defined in 20 CFR 404.1567(a) as follows:

> [C]laimant could lift/carry up to 10 pounds occasionally and lighter
> items such as small hand tools/individual case files frequently;
> stand/walk with normal breaks, for up to a combined total of 2 hours in
> an 8 hour day, and for no more than 15 minutes, continuously, sit, with
> normal breaks, for up to 6 hours in an 8 hours day; may not climb
> ladders, ropes or scaffolds; but, may otherwise climb ramps/stairs,
> balance, stoop, kneel, crouch, and crawl no more than occasionally; and,
> must avoid exposure to hazards, such as exposed—unprotected heights
> and excavations, and to exposed—unprotected dangerous moving
> machinery.

R. 24.  In his RFC analysis, the ALJ noted that there was no specific finding of

ongoing symptomology before 2007.  R. 26, 28.  Moreover, the ALJ found that there

was no way to ascertain, upon the current medical record, the degree of her

limitation before 2007.  R. 30.  The ALJ also concluded that he was unable to

ascertain the overall degree of limitation existing as of December 2003 with *any*

*degree of medical certainty* based upon her medical records.  R. 29–30.

After determining Claimant's RFC, the ALJ explained that her statements

concerning the intensity, persistence and limiting effects of her symptoms were not

credible to the extent that they were inconsistent with the RFC.  R. 30.  Particularly,

the ALJ found that her reported daily activities were not limited to the extent that

one would expect, given the complaints of disabling symptoms and limitations.  *Id*.

Moreover, the ALJ asserted that one would expect restrictions placed on Claimant

by a treating doctor before December 2003.  *Id*.  The ALJ also found that her lack of

symptom management through medications and failure to seek regular treatment

before the DLI supported his finding.  *Id*.  With respect to this finding, the ALJ

rejected Dr. Parikh's opinion that Claimant was totally disabled as of 2003 because

the treatment history between Claimant and Dr. Parikh was "quite brief" and Dr.

Parikh did not treat Claimant during the relevant time period.  *Id.*

Instead, the ALJ assigned persuasive weight to the testimony of the non-examining ME, Dr. Manfredi, that Claimant's overall degree of medical limitation could not be determined as of 2003.  R. 30–31.  The ALJ also found the RFC conclusions reached by the physicians employed by the State Disability Determination Services also supported a finding of "not disabled," and their opinions deserved "some weight."  R. 30.

Ultimately, the ALJ determined that Claimant was not disabled and was able to perform both her past relevant work and other jobs in the national economy as of the DLI.  R. 31, 390.

## II. LEGAL STANDARDS

### A. *Standard of Review*

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  This much is clear regarding the standard of review.  If supported by substantial evidence, the Commissioner's factual findings are conclusive.  *Id.*  If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the district court.  *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).  But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, courts have held that the standard of review is narrow.  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely

limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399–401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a Claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.* Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks

evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).[6] And, unlike most civil litigation in which a decision can be affirmed on any basis in the record, federal courts cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced."), *with Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record"). Therefore, the Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, No. 08 C 2861, 2013 WL 2285786, *7 (N.D. Ill. 2013) ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief.").

## B. Disability Standard

Disability Insurance Benefits are available to a claimant who can establish that she is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d

---

[6] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano*, 556 F.3d 562 (7th Cir. 2009). But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012). Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge: "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

736, 739–40 (7th Cir. 2009). The SSA and regulations require that a claimant must establish that he was disabled while insured. *See* 42 U.S.C. § 423(a) and (d). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if she is unable to perform her previous work and cannot, considering her age, education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. §423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. §404.1572(b).

The ALJ uses a five-step sequential analysis to determine whether a Claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i–v). Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's RFC; and (5) whether the claimant is capable of performing work in light of her age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that she cannot perform her past relevant work due to the limitations, the Commissioner carries the burden

of showing that a significant number of jobs exist in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

### A.    Contention of the Parties

Claimant argued that the ALJ erred in 1) determining the onset date of her disability; 2) evaluating her credibility; and 3) evaluating the medical opinions of record. The Commissioner contends that the ALJ's finding that Claimant was not disabled through December 31, 2003, his credibility assessment, and his evaluation of Dr. Parikh's opinion were proper and supported by substantial evidence. As explained below, the ALJ did not properly determine the onset date and failed to properly evaluate Claimant's credibility. However, the ALJ properly evaluated Dr. Parikh's and Dr. Manfredi's medical opinions.

### B. Analysis

#### 1. The ALJ Improperly Determined Claimant's Onset Date and Credibility

This case turns on the difficult question of when Claimant's multiple sclerosis symptoms became disabling. *See Lichter v. Bowen*, 814 F.2d 430, 435 (7th Cir. 1987) ("[T]he critical date is the *onset* of disability, *not* the date of diagnosis.") (citations omitted). The parties do not dispute that Claimant has been disabled since at least 2007 and that Claimant had the severe impairment of multiple sclerosis before December 31, 2003, the DLI. R. 23-24, 29–32; Dkt. # 19, at 4. However, the ALJ found, and Claimant disagrees, that she was not disabled by her multiple sclerosis symptoms at any time before the DLI. R. 23–24, 32.

It is essential that the disability onset date be correctly established and be supported by substantial evidence. "Titles II and XVI: Onset of Disability," 1983-1991 Soc. Sec. Rep. Serv. 49, 1983 WL 31249 (SSR 83-20). The ALJ is required to apply the analytical framework outlined in SSR 83–20 to determine the onset date of disability. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). SSR 83–20 defines the onset date of disability as "the first day an individual is disabled as defined in the Act and the regulations." *Id.*; SSR 83–20 at *1. To determine when Claimant's impairments became disabling, the ALJ must consider (1) Claimant's allegations; (2) Claimant's work history; and (3) the medical and other evidence. *Id.; Henderson by Henderson v. Apfel,* 179 F.3d 507, 513 (7th Cir. 1999). Of the three, the medical evidence is the key factor, and the chosen onset date should be consistent with it. *Id.* However, in cases where a claimant has a slowly progressive impairment, "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling and in such cases, it will be necessary to infer the onset date from the medical and other evidence." *Thomas v. Colvin*, No. 112-CV-160-JEM, 2013 WL 3337986, *7 (N.D. Ind. July 2, 2013) (citing SSR 83–20).

SSR 83–20 does not require an impairment to have reached the severity of an impairment listed in the regulations, as required under step three, but "[t]he onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months

or result in death." *Id.*; SSR 83–20 at *3. SSR 83-20 requires that the ALJ adopt the alleged onset date if it is consistent with the medical and other available evidence. *Id.* If no alternative date is clear from the evidence, SSR 83-20 requires the ALJ to obtain additional medical and nonmedical evidence from other sources, including "family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition." *Lichter*, 814 F.2d at 434-35. Failure to fully analyze the evidence according to the requirements of SSR 83–20 in a situation where onset must be determined necessitates reversal of the ALJ's decision. *Id.* at 352–53.

Claimant contends that the ALJ's determination of her onset date is not supported by substantial evidence because he failed to follow the SSR 83-20 analysis, and instead improperly applied a "medical certainty" standard. In particular, she argues that the ALJ improperly disregarded her allegations, misconstrued the medical evidence, and attributed improper weight to her working part-time for one week in 2006. Dkt. # 19, at 7-12.

In finding that Claimant's symptoms were not disabling before the DLI, the ALJ relied heavily on the lack of "consistent" medical evidence during that time. The ALJ correctly noted that there was not a complete lack of medical evidence before the DLI; Claimant sought medical treatment for various multiple sclerosis symptoms, including difficulty swallowing, dizziness, headaches, tripping, and "klutziness", before December 31, 2003. R. 26-27. Instead, the ALJ found that the

lack of "consistent" medical evidence before the DLI supported his finding that her limitations were not disabling at that time. R. 30. However, if the ALJ had applied SSR 83-20, the lack of consistent medical evidence before the DLI, and corresponding finding that he could not determine with "medical certainty" whether her symptoms were disabling, would not have been determinative. *See Lichter*, 814 F.2d at 435.

A review of the evidence in the record, portions of which the ALJ failed to adequately address, reveals that Claimant's alleged onset date of December 1, 2003 is not clearly inconsistent with the other available record evidence. Claimant testified at the hearing before the ALJ that her multiple sclerosis symptoms, including difficulty swallowing, dizziness, severe fatigue, headaches, and tripping began in 2002, and her limitations were disabling as of December 2003. R. 42-43, 45, 50, 60, 123, 134-35. She testified, and the medical records before the DLI confirm, that she sought treatment during that time period for these symptoms. *Id*; R. 325-57, 328-29, 331, 336, 343. Moreover, the ALJ failed to note that the medical records in 2004, 2005, and upon her ultimate diagnosis in 2007 reflect that she consistently reported an onset of severe symptoms beginning in 2003 or earlier, despite first applying for DIB in 2009. R. 355, 364-66, 385-86, 437. The ALJ also placed great weight on Claimant's failure to seek more aggressive treatment until 2007 without taking into account Claimant's explanations, including her discouragement by multiple misdiagnoses before the DLI and her loss of health insurance and significant financial strains in 2006. R. 134, 143-44, 146 ("I knew

something was wrong even though the doctors were telling me it was all in my head for a long time."); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("[T]he ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care.")

The ALJ also failed to explain how Claimant's brief work history after the alleged onset date supported a later onset date. The ALJ explained that Claimant "also worked since the alleged onset[,] indicat[ing] that her daily activities have, at least at times, been somewhat grater [sic] than the Claimant has generally reported." R. 30. However, Claimant testified that she worked part-time for one week in 2007 as a grocery bagger, but had to quit because she experienced numbness and tingling, and could not perform the job. R. 125-28. Claimant testified that she held no other jobs since 1998. *Id*. The ALJ failed to explain how Claimant's employment for 20 hours in 2007, from which she had to quit because of her severe multiple sclerosis symptoms, supports his finding that she was not disabled as of the DLI. *See Lichter*, 814 F.2d at 435-36.

The ALJ failed to adequately address Claimant's testimony concerning the nature of the physical limitations she experienced before the DLI and the medical records, which tend to support her alleged onset date. The ALJ's heavy reliance on some medical evidence without addressing other substantial medical evidence, failure to fully address the other evidence in his finding, and mischaracterization of certain evidence warrants remand. *See Id.; Nolen v. Sullivan*, 939 F.2d 516, 520 (7th Cir. 1991) (remanding for redetermination of onset date in part for ALJ's

mischaracterization that claimant's symptoms were not supported by record evidence).

However, even if the alleged onset date was not consistent with the medical records, SSR 83-20 requires that the ALJ obtain additional medical and nonmedical evidence. *See Lichter*, 814 F.2d at 435. Although the ALJ properly sent Claimant for a consultative evaluation with Dr. Manfredi, Dr. Manfredi could not opine on the date her limitations became disabling. The ALJ was required to obtain additional nonmedical evidence from other sources, including "family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition." *Id.*

Because the ALJ's determination of Claimant's onset date may have been different had he properly applied SSR 83-20, and because the ALJ failed to build a logical bridge between the evidence and his conclusion, his onset date finding is not supported by substantial evidence. *Villano*, 556 F.3d 562 (7th Cir. 2009). Accordingly, the case is remanded to allow for a consideration of the application of SSR 83-20 to Claimant's claim.

### 2. The ALJ Improperly Considered Claimant's Credibility

Claimant also argues that the ALJ improperly considered her credibility. A court must review the ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678. A reversal of the ALJ's decision on the basis of credibility is appropriate only if

the credibility determination is so lacking in explanation or support that it is "patently wrong." *Elder v. Astrue,* 529 F.3d 408, 413–14 (7th Cir. 2008). Factors that should be considered in evaluating credibility include the objective medical evidence, daily activities, allegations of pain, aggravating factors, the types of treatment received, medications taken, and functional limitations. *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006); 20 C.F.R. § 404.1529(c)(3); SSR 96–7p. The ALJ should give specific reasons for the weight given to an individual's statements. SSR 96–7p; *see also Schmidt v. Barnhart,* 395 F.3d 737, 746 (7th Cir. 2005) (an ALJ must give specified reasons for finding a Claimant's testimony to be less than credible). "[O]nce the ALJ has found that the Claimant suffers from impairments that could reasonably cause her symptoms, he may not disregard her allegations just because they are not fully supported by the medical evidence." *Tenhove v. Colvin*, 927 F. Supp. 2d 557, 574 (E.D. Wis. 2013) (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

Here, the ALJ failed to build a logical bridge between the evidence and his conclusion that Claimant's testimony was not credible. The ALJ found that Claimant was not credible for four reasons: (1) her daily activities were not limited to the extent one would expect; (2) she made infrequent trips to the doctors; (3) she took no medications; and (4) her described symptoms were generally inconsistent with the overall medical record. R. 30. In support of his finding, the ALJ cited several of Claimant's daily activities, including: taking care of her children, cooking,

doing laundry, grocery shopping with her husband, driving to school to pick up her children, taking an exercise class, leaving the house two to three times per week, loading the dishwasher, napping one and one half hours per day since 2005, and working. *Id.* The ALJ explained that taking care of children can be quite physically demanding and that her daily activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id.*

The ALJ's reliance on Claimant's daily activities was misplaced. There is a critical difference between daily living activities and activities of a full-time job, because a person in the home has more flexibility in scheduling, can get help from others when needed, and is not held to a minimum standard of performance. *Bjornson*, 671 F.3d at 647; *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (explaining that an individual's ability to care for her small children in the home is not inconsistent with the inability to work full-time outside the home). Here, the ALJ mischaracterized Claimant's testimony regarding the nature and extent of her daily activities. Claimant testified that before her DLI, she performed some daily chores no more than one hour per day and that they were "a little trying." R. 129, 132-33. Moreover, Claimant testified that she attended a yoga/stretching class *for individuals with special needs* four times. R. 47, 130-31. Additionally, as explained above, the ALJ also mischaracterized Claimant's remarkably brief work history of 20 hours total since the alleged onset date. The ALJ erred by failing to explain how Claimant's limited daily activities supported his credibility finding. *Villano*, 556 F.3d 562.

The ALJ was also critical that she did not take medication or receive the type of medical treatment "one would expect for a totally disabled individual." R. 30. An ALJ cannot reject a Claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Bjorson*, 671 F.3d at 646–48. Here, Claimant sought medical treatment from 2002 through 2005 for repeated complaints of dizziness, headaches, loss of balance, and/or problems swallowing. R. 325-57, 331, 336, 345-46, 355-56. The ALJ did not explain how this medical treatment, which at least partially corroborated her reported limitations during that time, was not the type of treatment one would expect from a totally disabled person. More concerning, however, is the ALJ's failure to explain what type of treatment one would expect for an individual totally disabled by multiple sclerosis. The ALJ "cannot play the role of doctor and interpret medical evidence…[and] substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Baird v. Astrue*, No. 09-CV-5764, 2011 WL 529045, *18 (N.D. Ill. Feb. 3, 2011) (reversing for failure to explain and cite medical testimony regarding the type of treatment expected for an individual with claimant's alleged disabling condition.) The ALJ may be correct that disabling limitations from multiple sclerosis would result in more frequent treatment or need for medication. However, the ALJ must include evidence to support such a conclusion in his opinion because he "is not qualified, on his own, to make such determinations." *Id.*

Here, the ALJ failed to address major aspects of the evidence and explain the reasoning behind classifying Claimant's testimony as inconsistent. The ALJ failed to build the requisite logical bridge between the evidence and his conclusion. This Court has been deprived of the ability to evaluate the validity of the ALJ's logic because he has failed to identify what in the record is inconsistent with Claimant's testimony. *Moore v. Colvin,* 743 F.3d 1118, 1126 (7th Cir. 2014). "An erroneous credibility finding requires remand unless the Claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin,* 739 F.3d 1046, 1051 (7th Cir. 2014). The ALJ's credibility determination was erroneous and requires remand.

### 3. The ALJ Adequately Considered the Medical Opinions

Although the case being remanded, the court addresses the following issues as they may be affect ta decision on remand. First, Claimant argues that the ALJ did not explain good reasons under 20 C.F.R. §404.1527 for the weight he afforded the non-examining ME, Dr. Manfredi's, testimony. Dkt. # 19, at 12-14. Second, she argues that the ALJ's reasons for discounting Dr. Parikh's opinion were legally insufficient. *Id.* All of Claimant's arguments are unavailing.

### a. Dr. Manfredi's Opinion

Claimant's first argument that the ALJ did not provide sufficient reasons for adopting Dr. Manfredi's opinion is not persuasive because the ALJ provided various adequate reasons for adopting the ME's opinion over Dr. Parikh's opinion consistent with 20 C.F.R. §404.1527(c) and (e). The ALJ may rely on the opinions of

physicians who are also experts in social security disability evaluation. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("The fact that these physicians reviewed the entire record strengthens the weight of their conclusions."); 20 C.F.R. § 416.927(f)(2)(1). To determine how much weight to afford a non-treating ME's opinion, the ALJ examines "the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii).

Here, the ALJ explained that he gave great weight to the findings of the ME because his opinion was consistent with the medical evidence of record. The ALJ relied on Dr. Manfredi's expertise as a neurologist and neurosurgeon, the medical field at issue in this case. R. 9. He explained that Dr. Manfredi reviewed Claimant's entire medical record. R. 9. The ALJ reviewed Dr. Manfredi's testimony at length and the support for the ME's opinion that Claimant's symptoms were not disabling as of the DLI. R. 9-10. The ALJ explained that Dr. Manfredi's assessment of Claimant was accompanied by explanation of the medical records that existed and the nature of the condition. R. 9-10. Specifically, the ALJ explained that Dr. Manfredi noted that Claimant's neurological testing and symptoms established multiple sclerosis disability in 2007. R. 9. However, Dr. Manfredi testified, and the ALJ noted, that there was no neurological testing before 2007, therefore it was his opinion that her symptoms were not disabling as of the DLI. R. 29. Accordingly, the ALJ provided sufficient reasons for adopting the ME's

opinion. *See Delgado v. Astrue*, No. 10 C 3963, 2011 WL 2489741, *15, 17 (N.D. Ill. June 21, 2011) ("[T]he ALJ ultimately provided sufficient reasons for giving the ME's opinion significant weight, including the ME's specialty in neurology and the fact that the ME had the opportunity to review all of the medical records."); *Bragg v. Astrue*, 686 F. Supp. 2d 803, 814-15 (N.D. Ill. 2010) (same).

Moreover, the Claimant asserts that Dr. Manfredi's opinion supported a finding of disability in 2003. Dkt. # 19, at 11. The Court rejects that argument. Reading the testimony as a whole, Dr. Manfredi opined that the Claimant was not disabled before December 31, 2003. Even in the best of light, the most that could be possibly tweezed from Dr. Manfredi's cross-examination is that the Claimant failed in meeting her burden of proof.

### b. Dr. Parikh's Opinion

Claimant's final argument regarding the ALJ's analysis of Dr. Parikh's retrospective opinion likewise fails. The ALJ properly noted that Dr. Parikh was not a treating physician before the DLI. Indeed, Dr. Parikh began his treatment relationship with Claimant nearly 4 years after her DLI. Instead, Dr. Parikh offered a retrospective diagnosis, meaning a "medical opinion of the Claimant's impairments which relates back to the covered period." *Estok v. Apfel,* 152 F.3d 636, 638 (7th Cir. 1998). For retrospective diagnosis, SSA regulations require independent record support "well-supported by medically acceptable clinical and laboratory diagnostic techniques" before a treating physician's retrospective opinion will be considered controlling. *Cohen v. Astrue*, 258 F. App'x 20, 27 (7th Cir. 2007)

(affirming ALJ's finding that retrospective diagnosis was not entitled to great weight because it was rendered years after DLI and was not supported by contemporaneous evidence); *Dumler v. Barnhart*, 114 F. App'x 212, 214 (7th Cir. 2004) (affirming ALJ's rejection of treating physician's opinion supported only by applicant's subjective complaints.)

The ALJ properly declined to attribute more weight to Dr. Parikh's retrospective opinion. The ALJ rejected Dr. Parikh's opinion because he had only a short treatment relationship with Claimant that began four years after the DLI, his opinion sharply contrasted with other evidence in the record, and it was not clear whether Dr. Parikh was familiar with the definition of "disability" under the SSA and regulations. R. 30-31. Although the ALJ did not specify what record evidence "sharply contradicted" the treater's opinion[7], he correctly discounted Dr. Parikh's opinion because Dr. Parikh identified no specific contemporaneous records supporting his finding, which symptoms were disabling in 2003, or to what degree the symptoms were disabling. R. 28–31. *See Cohen*, 258 F. App'x at 27; *Hilkert v. Astrue*, No. 12-CV-55-JPS, 2013 WL 149347, at *5–6 (E.D. Wis. Jan. 14, 2013) (ALJ built a logical bridge from the contemporaneous medical assessments before the Claimant's DLI to the conclusion that the treating doctor's opinion as to Claimant's multiple sclerosis symptoms was not corroborated by contemporaneous evidence). Moreover the ALJ's properly rejected Dr. Parikh's opinion because the ultimate

---

[7] Although the did not specify any instances of Dr. Parikh's opinion contrasting with the other evidence of record in that paragraph, he analyzed contrasting evidence, including the lack of treatment from 2005 to 2007, and the resolution of dizziness in 2003 after medication, throughout his opinion.

issue of disability is reserved for the ALJ. *Denton v. Astrue*, 596 F.3d 419 (7th Cir. 2010); 20 C.F.R. § 416.927(d).

In analyzing an ALJ's opinion for fatal gaps or contradictions, a reviewing court may not reweigh the evidence that has been determined at the administrative level or substitute its own judgment for that of the Commissioner rather it gives the evidence a "commonsensical reading rather than nitpicking at it." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (quoting *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Godbey v. Apfel*, 238 F.3d 803, 807 (7th Cir. 2000). "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989). The ALJ's assertion that Dr. Parikh's opinion "contrasts" could have been better fleshed out; however, the ALJ's analysis of the medical opinions will not be disturbed. This is the type of error, which is harmless if the ALJ remedies his mistake through subsequent analysis and in doing so renders remand futile. *See Craft,* 539 F.3d at 675. In light of the ALJ's otherwise appropriate analysis, his rejection of Dr. Parikh's retrospective opinion was appropriately determined. However, because the Court remands this case for other reasons, the ALJ should contact Dr. Parikh to solicit additional information regarding the basis for his opinion. *Moore v. Colvin*, 743 F.3d 1118 (7th Cir. 2014) citing *Simila v. Astrue*, 573 F.3d at 516–17 (7th Cir. 2009).

## IV. Conclusion

Based on the foregoing, the Court hereby GRANTS the relief requested in Claimant's Memorandum in Support of Summary Judgment and REMANDS this matter for further proceedings consistent with this opinion.

It is so ordered.

Entered: July 30, 2014

**Iain D. Johnston**
**U.S. Magistrate Judge**